# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
September 17, 2013 Session

## STATE OF TENNESSEE v. JEROME MAURICE TEATS

**Appeal from the Criminal Court for Davidson County**
**No. 2009-D-2955      Steve Dozier, Judge**

---

**No. M2012-01232-CCA-R3-CD - Filed January 10, 2014**

---

Jerome Maurice Teats ("the Defendant") was convicted by a jury of one count of aggravated robbery and four counts of especially aggravated kidnapping. The trial court subsequently imposed an effective sentence of fifty years' incarceration. In this direct appeal, the Defendant raises the following issues: (1) the trial court erred in denying his motion to suppress; (2) the trial court erred in denying his motion to disqualify the district attorney general's office; (3) his convictions for especially aggravated kidnapping must be reversed on due process and double jeopardy grounds; (4) the trial court improperly instructed the jury on criminal responsibility; (5) the evidence was not sufficient to support his convictions; (6) cumulative error; and (7) his sentence is excessive. Upon our thorough review of the record and applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments**
**of the Criminal Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which ALAN E. GLENN, J., joined. JOSEPH M. TIPTON, P.J., filed a dissenting opinion.

Patrick T. McNally (on appeal and at trial) and James Todd (at trial), Nashville, Tennessee, for the appellant, Jerome Maurice Teats.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Rachel Sobrero and Pamela Anderson, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

The Defendant was indicted with his codefendant, Tirrone Akillia Simpkins, in October 2009 for one count of aggravated robbery and four counts of especially aggravated kidnapping, all arising out of May 2009 offenses committed at a Shoney's restaurant. The Defendant was tried before a jury in November 2011,[1] during which the following proof was adduced:

Jack Liev testified that, early on the morning of May 18, 2009, he arrived at the Shoney's restaurant near the intersection of Highway 70S and Interstate 40 in Bellevue, Davidson County, Tennessee. As he walked in the entrance, he was "met by the manager who was fairly frantic and explained that he'd just been robbed." The manager requested that Liev call the police. The manager and Liev walked into the parking lot and, as Liev called 911, the manager pointed out an individual walking down the street as one of the perpetrators. As Liev spoke with the 911 dispatcher, he got into his truck and drove toward the road in an effort to keep the individual in sight. Liev recalled that the person was wearing a black hoodie.

Liev crossed the road and pulled into a parking lot across the street from the Shoney's. He lost sight of the individual briefly as the individual went behind some buildings, but then he saw the person again. When the police arrived, Liev directed the officers to the place where he last saw the suspect. Liev then returned to the Shoney's and had breakfast.

On cross-examination, Liev reiterated that the person pointed out by the manager was walking, not running, down the street. The person was between fifty and one hundred yards from the restaurant. Liev stated that, while he was on the phone with the dispatcher, the person caught sight of him and made "an immediate left." The suspect did not run or brandish a weapon.

A recording of Liev's 911 call was played for the jury. Liev reported the robbery and reported a suspect's description and location. Liev reported that he did not see a weapon.[2]

---

[1] Prior to trial, the case against Simpkins was severed. Simpkins subsequently pleaded guilty as charged. See Tirrone Akillia Simpkins v. State, No. M2012-01558-CCA-R3-PC, 2013 WL 775957, at *1 (Tenn. Crim. App. Feb. 28, 2013), perm. app. denied (Tenn. June 12, 2013).

[2] Another 911 call also was admitted into evidence by stipulation. In this call, a woman identified

(continued...)

Francisco Carrizosa Perez testified that he had worked at the Shoney's for ten years as a cook and food preparer. On the morning of May 18, 2009, he arrived at 5:00 a.m. and began working, as the restaurant opened for business at 6:00 a.m. At 6:05 a.m., he opened the back door of the restaurant to take out some trash. Two men accosted him, one wearing a mask and holding a pistol. The men told him not to look at them. The man with the gun held the gun to Perez's head and ordered him to the rear of a hallway in the building. The man told him not to watch anything. The hallway led to the area with the refrigerators and shelves for storage.

As Perez stood in the hallway, the man without the mask brought another employee into the hallway. A few minutes later, two other employees arrived. Later, the manager arrived. The manager told them to sit down and be still. Eventually, all of them left the area.

Arcelia Ruiz testified that, as of May 18, 2009, she had worked for Shoney's for four years. That morning, she was preparing food for the food bar when two men came into the back area of the restaurant. One of the men had his face covered. Both men were carrying pistols. The masked man grabbed Perez and put the gun to Perez's head. The other man approached Ruiz and threatened her with his gun. The man screamed at her "not to look" and asked her where the office was. She told him that the manager was in the office. The man who was threatening Perez sent Perez into the hallway and then went to the office. She then was put into the hallway with Perez. She testified that the man without the mask was pointing his pistol at them. He asked how many people were in the restaurant and then watched for them to arrive. When Dora arrived, the man pointed the pistol at her and told her to join Perez and Ruiz. Dora was confused, and when Teresa arrived, Teresa took Dora by the hand and they joined Perez and Ruiz.[3] The man without the mask remained nearby, "[g]uarding [them] so [they] wouldn't move or anything." He ordered them to move further down the hallway, and they complied.

Later, the manager and the other perpetrator came to the hallway. Ruiz was not looking at the men, but she heard a voice she did not recognize tell them all to "bow down." Ruiz testified that they all complied and that their assailants then left.

---

[2](...continued)
only as Teresa reported, "We just got robbed." Teresa also reported, "they both had guns" but that no one had been injured. She also reported that the assailants had put them into the stockroom, "which was nice," and told them to "get in the corner" but did not threaten them.

[3] Teresa, identified in the indictment as "Teresa Diane Cline," did not testify. The record reflects that she had passed away before trial. The record also reflects that the manager was unavailable to testify.

3

Dora Delacruz Moreno testified that she had been working at the Shoney's for eight days as of May 18, 2009. On that morning, she was preparing foods to be placed on the buffet. As she was walking toward the kitchen, she saw a masked person "taking the manager toward the safe." She then saw another man "with his face uncovered." This man pointed a gun at her and spoke to her "a little strongly." Because she did not speak English, she did not understand what he said, so she remained where she was and "continued to stir the gravy." The man continued to speak to her. Teresa then came into the area and led her "to where the other people were." Moreno clarified that the other people were Perez and Ruiz. The man waved his gun at them. The manager then arrived and "made signs for [them] to all get down on the floor the way he did." The two men then left. On May 22, Moreno went to the police station and identified from a photographic array the man without the mask, Tirrone Simpkins.

On cross-examination, Moreno testified that she and the others stayed in the hallway/storage area for four to five minutes after the men left. She stated that they were in the area a total of "maybe eight minutes."

Officer Derek Smith of the Metropolitan Nashville Police Department ("MNPD") testified that he was on patrol during the Shoney's incident. He responded to the call that came in "right around 6 a.m. in the morning." He spoke with the manager and obtained a description of the two suspects, which he then broadcast. The description he announced was "two male blacks, both around 6 feet tall, all wearing black, and both had masks on." He also broadcast that one of the suspects "ran north on Highway 70 and one had ran [sic] south on Highway 70."

The manager took Officer Smith around the restaurant, indicating the sites of the suspects' activities. Officer Smith described the office as "real small," "just enough for like a desk." At the front of the restaurant, he saw "a black trash bag laying down on the floor underneath the register." He added, "The till was laying on the floor. There was a bunch of – I don't know if it was business cards or something laying all over the floor. But you could tell that the till had been turned upside town or something of that effect." Officer Smith clarified that, by "till," he meant the cash register drawer. Officer Smith testified that he noticed "a small laceration to the left top" of the manager's head.

Officer Patrick Ragan[4] of the MNPD was on the burglary squad on May 18, 2009. He responded to the Shoney's call and drove to the area where a suspect had been seen. As he drove through the neighborhood, a resident flagged him down and reported seeing someone

---

[4] Although the transcript of the trial indicates the officer's last name as "Reagan," the witness spelled it as "Ragan" at the hearing on the Defendant's motion to suppress.

run into the crawl space beneath a house. Officer Ragan awaited the arrival of another unit. When Sergeant Teague arrived, they walked to the house, and Sgt. Teague opened the door to the crawl space and ordered the suspect to come out. The suspect came out and "was pretty cooperative." The suspect was placed in handcuffs, and Officer Ragan entered the crawl space to look for a gun. He did not find a gun.

The suspect was taken to Officer Ragan's patrol car and interviewed by Detective Stokes. Officer Ragan then drove the suspect to the west precinct.

Sgt. Vernon Teague of the MNPD testified that he responded to the call of an "armed robbery." A woman called in a person running in her back yard, so he went to her house on Bellevue Manor Drive. As he got out of his car, he saw footprints in the wet grass. As he followed the footprints, a citizen approached him and told him that he had seen a crawl space door that was open, so he had closed and locked it. Sgt. Teague saw footprints leading under the house. He and other officers opened the crawl space door and yelled for the person to come out, or they were going to send in a dog. A person, whom Sgt. Teague identified as the Defendant, "responded right away and said, 'I'm coming out.'" Sgt. Teague took the Defendant into custody and searched him but did not find a gun.

A short time later, Sgt. Teague heard a report that the second suspect had been seen running near the Bellevue Mall. Sgt. Teague drove to that location and, after a chase, apprehended the second suspect.

Officer Paul Sorace of the MNPD also responded to the Shoney's call. While looking for one of the suspects, he came upon a "bundle of clothes" containing a black pair of pants and a black sweatshirt. He subsequently assisted in apprehending the suspect in the Bellevue Mall area. Officer Sorace stated that this man was Tirrone Simpkins.

Detective Diana McCoy of the MNPD responded to the Shoney's call, arriving in less than a minute. She had received a description of the suspect vehicle, a white SUV. She saw a vehicle matching the description parked across the street from the Shoney's. She approached the vehicle and found a gray sweater or sweat top "in the bushes to the front of the vehicle." She ran the license plate tag of the vehicle and learned that it was registered to the Defendant. As she began to walk around the area, she found a handgun and a black hoodie.

Officer Tim Matthews, a crime scene investigator for the MNPD, testified that he worked the scene. He processed the back door of the restaurant for latent fingerprints. He also responded to the white SUV parked across the street. He photographed the vehicle, opened it, and took photographs of the interior and contents, including a "large black plastic

5

garbage bag . . . full of money, loose money, bills, coins and rolled coins." He also processed the vehicle for latent fingerprints. Inside the SUV, he found a wallet containing a Tennessee driver's license for Jerome Maurice Teats.

Officer Matthews also collected the gun and clothing found by Detective McCoy. Officer Matthews testified that the gun was loaded. He described the gun as a .357 magnum revolver with a six-inch barrel.

Lorita Marsh, a "police identification supervisor," testified as an expert in latent fingerprint examination. Marsh testified that two latent prints recovered from the rear left door of the SUV matched the Defendant. Latent prints recovered from the rear right door matched the codefendant, Tirrone A. Simpkins.

Detective William Stokes of the MNPD responded to the scene and witnessed the Defendant being taken into custody. After the Defendant was placed in the back of a patrol car, Det. Stokes advised the Defendant of his Miranda rights. The Defendant stated that he understood his rights and that he wanted to talk to Det. Stokes. The Defendant then told Det. Stokes "that he committed the robbery with another male black named Tirrone." The Defendant also told Det. Stokes that the white SUV belonged to him.

After the Defendant was taken to the police station, Det. Stokes again advised the Defendant of his Miranda rights, and the Defendant executed a written waiver. The Defendant then gave a statement which was audio-recorded and transcribed. In his statement, the Defendant explained that the codefendant approached him about committing the robbery. The Defendant initially declined but then agreed after his unemployment insurance ran out. On the morning of May 18, 2009, they both got into the Defendant's SUV, and the Defendant drove them to a parking lot near the Shoney's. The men got out and waited behind the restaurant, trying to decide what to do. When someone opened the back door, the Defendant and the codefendant went into the Shoney's. The Defendant stated that he was the one who demanded the money from the manager. The Defendant was armed with a .357. While the Defendant was getting the money, the codefendant, armed with a BB gun, was "securing" the other employees. After the Defendant got the money, they both ran out of the restaurant. The Defendant threw his gun in some bushes. He then decided to hide in the crawlspace under a house, where the police found him.

The Defendant explained that the codefendant "put all the women . . . [in] some area in the back of the store, he secured all of them and pushed them over into the area while I went up front." The Defendant added that he held "the guy" at gunpoint and took him up front, where the man put the money into a bag. The Defendant stated that he got his gun from the codefendant. The codefendant had a BB gun that looked like a real gun. The

6

Defendant did not know why the codefendant gave him the real gun and kept the BB gun for himself. The Defendant described their preparations immediately before the robbery as follows:

> So we walked to the back of the Shoney's and then he was like, he was like, "What do you think we should do?" I said, "I don't know man," I said, "I'm not sure man, what- whatever you do that's what I'm gonna do." And then we sat there for about five more minutes then the guy from the inside opened up the back door, and we both ran in there . . . .

James Teats, Sr., the Defendant's father, testified on behalf of the defense. Teats stated that he raised the Defendant and his four other children. Teats had custody of his children because the children's mother had mental health problems.

In May 2009, the Defendant was living with Teats and had been for several years. The Defendant had been employed by Comcast and also had attended community college at Nashville Tech. Teats began noticing changes in the Defendant:

> Well, he got really depressed when he got laid off his last job at Comcast. And he started coming to me. He started coming to me saying he was getting nervous. And he quit eating. He would break out in a sweat. And he was – he come [sic] to me and he talked to me one day. He said, dad, I think I'm having momma's illness. I'm so nervous I don't know what to do.

> And he quit eating. The only thing he could eat was Ramen Noodles. And I begged him to go to the doctor. And he kept making excuses.

> . . . .

> His eyes would be bulging out like they wanted to pop out of his head.

> . . . .

> He lost a lot of weight.

After the Defendant was arrested, Teats discovered a lot of over-the-counter medications in the Defendant's room as well as "a lot of bottles of urine."

Teats stated that he noticed the changes in his son over a period of several months prior to the Shoney's incident.

7

James Teats, Jr., the Defendant's older brother, testified that he was living in Fairview, Tennessee, in 2009. He would visit his family in Nashville twice a month during family gatherings. He began to notice changes in the Defendant: "I began to notice . . . him becoming isolated and then he – we'd be outside and everyone would be looking normal and he'd just begin to sweat profusely. . . . And then he also acted nervous-like." Teats, Jr. also noticed the Defendant losing weight. Teats, Jr. stated that he noticed these changes "probably over a year or so" prior to the Shoney's incident.

Juanita Carney, the Defendant's sister, testified that she was a nurse technician. She and her family were "really close." She, too, began to notice changes in the Defendant:

> I observed him acting really depressed and on edge. He would get angry quite often and more and more often. And he never seemed to be able to complete a task at all that my dad would have him to do around the house. He would frequently just leave in the middle of doing what my dad needed him to do and would just be in his room just looking like he was spaced out.

She explained that, when the Defendant was healthy, he "would be very helpful" and not abandon projects.

Carney also noticed that the Defendant was losing weight and that he was "sweating excessively." His behavior became "odd" and his room, previously neat, became "very messy; clothes everywhere; food everywhere." She became very concerned.

A few weeks before the Shoney's incident, Carney hosted a family get-together at her house. When the Defendant arrived, she testified,

> his eyes were just bulging out of the sockets. And he was shaking and acting really nervous like he was on edge. He couldn't even give me a direct answer when I said, hi, how are you doing. He just looked at me.
>
> And then during the course of the meal I asked him about going to the doctor to see what was going on and he just got very angry with us and just started getting very offensive and would not look any of us in the eye. His eyes were just bulging, they were jumping. He couldn't sit still and was acting very angry throughout the course of the dinner.

Carney testified that, based on her medical training, she suspected that the Defendant had a thyroid condition.

Carney discussed her concerns with her family, and they decided to do an "intervention" on her next day off in order to take the Defendant to the doctor. They scheduled the intervention for May 19, 2009, the day after the Shoney's incident. Because of the Defendant's arrest, they were not able to conduct the intervention.

After the Defendant was arrested, Carney helped to clean his room. She discovered over fifteen bottles of vitamins "to help with nervousness, with stress, with fatigue."

Malia Bodruzzaman, the Defendant's fiancé, testified that, when she first met the Defendant six years prior, he "was always working out and a health fanatic and . . . sports oriented." Then, she continued, "[i]t's like he changed into a different person." She explained,

> Well, physically he started losing weight. The – the eyes started bulging more but he was losing weight gradually until it increased to where . . . it was faster, the weight loss.

> And – and I noticed agitation. And I guess this would be mentally. He – he seemed pretty mentally imbalanced to me. And like he would say things that were off the wall or mumble to himself or – and when we would be talking about something, he would say things that are just, you know, off the wall and not pertaining to what we were actually talking about or what I asked him.

> And physically I noticed a lot of changes. And not just weight loss and his eyes, it was – he – it was a pretty scary sight to see somebody change like that, yet I didn't really think – I thought it was just him losing weight. Even if he ate, it didn't seem to – he didn't seem to gain weight or anything.

> And mentally he – I could say – I would – I would describe it as somebody on edge pretty much. Like how I would really just say is like someone that's going crazy.

She began noticing these changes during the six months prior to the Defendant's arrest.

Jeffrey Alan Teats, the Defendant's other brother, testified that, in the months preceding the Defendant's arrest, the Defendant could no longer play basketball as well as he once had. He also noticed the Defendant's hands shaking when they played video games, and he stated that the Defendant could not seem to stay focused on one activity at a time.

9

Dr. Murray Smith, board certified in internal medicine, testified that, after the Defendant's arrest, he was retained to examine the Defendant. Dr. Smith testified that he spoke with the Defendant's family members and reviewed the Defendant's medical records. In June 2009, blood tests revealed that the Defendant's thyroid function was "severely abnormal." Dr. Smith also met with the Defendant three times in 2010. Based on Dr. Smith's review and examinations, Dr. Smith diagnosed the Defendant as suffering from Grave's disease. According to Dr. Smith, Grave's disease involves thyroid toxicosis, resulting from an over-production of the thyroid hormone, thyroxine. Dr. Smith explained that "what thyroid toxicosis means is that the body, the cells, are poisoned by the thyroxine. And that poisoning occurs everywhere including the brain." Dr. Smith opined that, on May 18, 2009, the Defendant was both physically ill and also "severely mentally ill with psychosis due to the thyroid toxicosis." As to the Defendant's actions at Shoney's, Dr. Smith testified, "I believe he was not rational to be able to understand the situation, to make good choices about how to handle the situation or be appreciative of the consequences of the behavior."

In conjunction with his examination of the Defendant, Dr. Smith prepared a written report which was admitted into evidence. This report includes the following:

Thyrotoxicosis has been known for at least two centuries to cause severe physical disease. Since 1896, many medical reports have documented severe mental status changes caused by thyrotoxicosis, including psychosis. In addition to severe anxiety, other mental changes frequently occurring because of thyrotoxicosis include confusion, racing thoughts, and impulsive reactivity. The mental changes are similar to the effect produced by stimulant drugs. The excessive thyroid hormone acts to drive the cellular metabolism to a higher level than normal with resultant cellular dysfunction. The excessive thyroid hormone essentially produces a state of involuntary brain cell intoxication.

[The Defendant] exhibited classic progressive physical and mental changes caused by thyrotoxicosis beginning in the Spring of 2008. Because of his fear he had a mental diagnosis and because of his terrible experiences with the consequences of his mother's mental illness, he resisted professional medical assistance. Eventually, the progressive mental dysfunction caused by the thyrotoxicosis resulted in his inability to make a rational decision to get professional help. He also began exhibiting abnormal behavior noted by his family and fiancé which he could not explain. He also had hallucinations as a result of his brain cells['] pathological dysfunction state. His mental state at the time Tirrone Akilla [sic] Simpkins came to him in May 2009 made him

10

unable to resist the demands made by Mr. Simpkins, as well as impairing [the Defendant's] judgment and causing impulsive decision making.

It was stated by the Vanderbilt Forensic Evaluation team that if [the Defendant's] thyrotoxicosis (Grave's disease) was not properly treated, it could have a significant effect on his mental status. At the time of the robbery on 05/18/2009, [the Defendant's] Grave's disease was far advanced, active, and never treated.

It is my professional opinion, based on my experience and training, that the advanced disease of thyrotoxicosis present in [the Defendant] at the time of the robbery on 05/15/2009 [sic] resulted in such severe mental dysfunction that [the Defendant] could not make reasonable judgments and decisions or resist coercion.

On cross-examination, Dr. Smith stated that psychosis occurred in about ten to twenty percent of persons suffering from Grave's disease. He also stated that Grave's disease could be controlled through medication. The Defendant was placed on medication at the end of June 2009, and it was "working." Dr. Smith acknowledged that the Defendant did not report having hallucinations to the psychiatric nurse who examined him in June 2009. Dr. Smith explained that the Defendant had a "phobia" about being diagnosed with a mental illness because of his mother's mental illness.

In rebuttal, the State called Staci Turner, an adult psychiatric nurse practitioner. She performed an initial psychiatric intake evaluation on the Defendant on June 15, 2009. The evaluation lasted twenty to thirty minutes. The Defendant did not appear to her to be experiencing any hallucinations at the time. He did not report experiencing any hallucinations at that time. She did not note any signs of psychosis during her evaluation.

On cross-examination, Turner stated that the Defendant had "discussed symptoms of anxiety" during the evaluation.

Dr. Kimberly Brown, a forensic psychologist, also testified for the State in rebuttal. She received a request from the trial court in this case on October 1, 2009, to conduct an evaluation of the Defendant. She reviewed various records in preparation for her evaluation, and she met with the Defendant on November 9, 2009, and December 7, 2009. The first meeting lasted forty minutes, and the second meeting lasted one hour and fifteen minutes.

11

Dr. Brown testified that psychosis is "a break from reality." She added that, during her interviews with the Defendant, she did not note any signs of psychosis. Rather, she thought,

> [H]e was very organized in his thinking. He was very logical. [She] had no trouble understanding him, he had no trouble understanding [her]. He was very cooperative and pleasant. It was a very normal conversation. He was able to provide a lot of details for [her] about his life.

Dr. Brown, however, acknowledged that the Defendant "described sometimes people calling his name or hearing a knocking on the door and there not being anybody there." She also acknowledged that the Defendant was on medication for Grave's disease when she met with him.

As to the Defendant's state of mind on the morning of May 18, 2009, Dr. Brown testified, "I guess my opinion was that he wasn't suffering from a mental problem that caused him to not know what he was doing or appreciate the wrongfulness of his actions." She explained that the circumstances of the offenses

> indicated that not only did he know the wrongfulness of his alleged conduct, but he took several steps to try to evade detection or keep from getting caught.
>
> So for example: Arriving at a building when it first opens or when it is still somewhat dark, wearing a mask, having an extra set of clothes on to help conceal identity, running from the scene, hiding; those are all behaviors that indicate to me that someone is aware of what they are doing is wrong and they are trying to keep from being caught or detected.

Dr. Brown added that the Defendant's statement to the police "strengthen[ed]" her opinion, describing his statement as "[v]ery articulate, intelligent, [an] organized man who had a good ability to communicate in a rational clear manner."

Det. Stokes, recalled by the State, stated that, during his initial interview of the Defendant, the Defendant asked if it would help him if he provided information about other crimes. Later, during his statement at the station, the Defendant provided detailed information about another crime.

On the basis of this proof, the jury convicted the Defendant of one count of aggravated robbery and four counts of especially aggravated kidnapping. After a hearing, the trial court sentenced the Defendant as a Range II offender to seventeen years for the aggravated robbery

conviction and thirty-three years for each of the especially aggravated kidnapping convictions. The trial court ordered the kidnapping sentences to be served concurrently to one another but consecutively to the aggravated robbery sentence, for an effective sentence of fifty years in the Tennessee Department of Correction ("TDOC").

In this appeal as of right, the Defendant raises seven issues: (1) the trial court erred in denying his motion to suppress; (2) the trial court erred in denying his motion to disqualify the district attorney general's office; (3) his convictions for especially aggravated kidnapping must be reversed on due process and double jeopardy grounds; (4) the trial court improperly instructed the jury on criminal responsibility; (5) the evidence was not sufficient to support his convictions; (6) cumulative error; and (7) his sentence is excessive. We will address each of these issues in turn.

## **Analysis**

### *Denial of the Defendant's Motion to Suppress*

In February 2011, the Defendant filed a motion to suppress his statements to the police. The Defendant contended that his initial statement was made without the benefit of <u>Miranda</u> warnings and, thus, was inadmissible; that this taint carried over to his subsequent statement made after he was given his <u>Miranda</u> warnings; and that his medical condition rendered him unable to validly waive his rights to remain silent and to have a lawyer present. The State resisted the motion, and the trial court held a hearing in March 2011 at which the following proof was adduced:

Dr. Murray Wilton Smith testified that he was the assistant medical director at Cumberland Heights Alcohol and Drug Treatment Center. He had been licensed to practice medicine in Tennessee since 1964. His experience included twenty years of internal medicine and twenty years of "addiction medicine." He performed a "series of evaluations" on the Defendant related to his "medical problem called hyperthyroidism." His evaluations included reviewing the Defendant's medical records from the TDOC; Dr. Kimberly Brown's report; and a transcript of the Defendant's interview with the police. He also met with the Defendant on three occasions and spoke with members of the Defendant's family and the Defendant's fiancé. Dr. Smith then prepared a written report, which was admitted into evidence.

Dr. Smith testified that Grave's disease has varying effects on different individuals. The TDOC records indicated that, in June 2009, the Defendant was suffering from "a very high level of thyroxine which is the thyroid hormone that is toxic." Dr. Smith clarified that the Defendant's blood test indicated that his level of thyroxine was "about four to five times

13

higher" than normal. The Defendant's reported symptoms began about a year prior to June 2009. Dr. Smith first met with the Defendant in June 2010, a year after he was put on medication for his condition. Dr. Smith stated that the Defendant reacted well to his medication.

Dr. Smith testified that the symptoms the Defendant reported experiencing prior to being medicated included "severe anxiety, restlessness, unable to sleep, weight loss, nausea, dizziness, nose bleeds and then later on as it progressed he developed a psychosis with hallucinations and grossly abnormal behaviors." As an example of a "grossly abnormal behavior," Dr. Smith referred to the Defendant keeping his urine in bottles in his room. When asked about the reported hallucinations, Dr. Smith explained,

> He would see people in the other side of the room and then go over to see if they were there and they weren't there. He would see people out in the yard beside the driveway and go to look and there would be nobody there. And he would hear knocking on the door, go to the door to let the person in and there would be no one there.

Dr. Smith also stated that, prior to being medicated, the Defendant was unable to think logically "[b]ecause his brain was poisoned, which is what toxic means is the brain was poisoned by the toxic effects of the thyroid hormone that was in excess."

Asked about his opinion of the Defendant's mental state on May 18, 2009, Dr. Smith responded, "he had psychosis due to thyrotoxicosis with hallucinations."

On cross-examination, Dr. Smith affirmed that the Defendant had been diagnosed with Grave's disease and stated that the "Comprehensive Textbook of Psychiatry says that about 20 percent of Grave's disease have psychosis." Dr. Smith also stated that he reviewed some of the Defendant's school records: "In the fall of 2007 and in the spring of 2008 he had excellent grades. Then beginning in the summer of 2008 his grades fell off much lower. So we have documentation that his ability to perform in school was decreased at the same time his symptoms of thyrotoxicosis began."

When asked whether the Defendant had reported trying to self-medicate prior to his diagnosis, Dr. Smith responded,

> [The Defendant] had an experience in that as a child. His mother had bipolar illness and was hospitalized multiple times in psychiatric hospitals. As a result of that, when he developed the psychiatric symptoms that were basically for him identical to his mother's illness and he saw how badly she

14

had been treated and talked about, he was afraid to go to a doctor and be diagnosed so he treated himself. He treated himself with something to calm him down because he was so nervous and anxious and agitated.

Dr. Smith clarified that the Defendant reported that he took "sleeping pills, tranquilizers and drank some." According to Dr. Smith, these efforts "worsened and would be expected to worsen the symptoms and decrease his mental functioning in terms of his thinking."

Confirming that he understood the legal definitions of intentional and knowing, Dr. Smith testified that, in his opinion, the Defendant was not able to form the mental states of intentional or knowing in May 2009 as a result of the Defendant's medical illness "[b]ecause his brain function was toxic or poisoned by his mental illness caused by his thyroid disease." Dr. Smith added,

> [The Defendant] could mechanically do things like dress himself or drive the car, but the finer points of reasoning where he would reflect on the circumstances, the different choices, the consequences of those different choices, that fine reasoning, that higher thinking was not possible because his brain cells were not functioning properly because they were poisoned by the excess thyroid hormone.

Dr. Smith testified that the Defendant would not be able "to reasonably resist" pressure from the codefendant.

Dr. Smith also testified that it was his "professional opinion that [the Defendant's] mental state at the time on the 18th of May, 2009, was such that he could not knowingly understand to waive his Miranda rights."

Officer Patrick Ragan of the MNPD testified that he was present at the time the Defendant was found hiding under the crawlspace. When the Defendant crawled out, Officer Ragan and at least two others were present. The officers "grabbed his hands and placed him in handcuffs and asked him, you know, where – where the gun was for [their] safety and for everybody else's safety." The Defendant did not have the gun in his possession, and Officer Ragan did not find it in the crawlspace. Officer Ragan then walked the Defendant to his patrol car and placed him inside. Officer Ragan stated that the Defendant "was pretty compliant" and "didn't resist any" during their walk to the car. Officer Ragan thought that there "was probably another officer with" them, and he testified that there was "no force used." Officer Ragan then "had a detective come out to go to talk with him there at the scene. [They] were trying to locate the pistol so a kid wouldn't find it." Officer Ragan stated that he witnessed Det. Stokes advise the Defendant about his Miranda rights.

15

Officer Ragan subsequently drove the Defendant to the police station. During the drive, the Defendant did not say anything about his health or about needing medical attention.

On cross-examination, Officer Ragan acknowledged that, when they initially asked the Defendant where the gun was, the Defendant stated that he did not have it. This interaction occurred before the Defendant was given his Miranda warnings. Officer Ragan stated that, after Det. Stokes gave the Defendant his Miranda warnings, the Defendant "was very forthcoming and he was – he was very cooperative."

Det. William Stokes testified that, when he arrived on the scene where the Defendant was located, the officers already were handcuffing him. As Officer Ragan and Sgt. Teague walked the Defendant to the patrol car, Det. Stokes heard Sgt. Teague tell the Defendant "to simply cooperate with the detective and tell him everything that he wanted to know." After the Defendant was in the car, Det. Stokes asked him his name, to which the Defendant replied "Jerome Teats." At that point, 6:30 a.m., Det. Stokes verbally advised the Defendant about his Miranda rights. Det. Stokes asked the Defendant if he understood his rights and the Defendant responded affirmatively. The Defendant told Det. Stokes that he wanted to talk with him about it. The Defendant then gave the detective "pretty detailed information" about what had happened and provided information about his accomplice. The Defendant also agreed to provide more detail at the police station.

At the station, Det. Stokes repeated the Miranda warnings to the Defendant. The Defendant indicated that he understood and signed the written rights waiver at 9:30 a.m. The Defendant again agreed to speak with the detective. The Defendant "never told [Det. Stokes] he did not feel well." The Defendant did not ask to go to the hospital. He did not ask for a drink of water or to go to the restroom.

On cross-examination, Det. Stokes acknowledged that Sgt. Teague told the Defendant something similar to "better tell the detective everything he needs to know." Det. Stokes denied that this advice was a threat.

The Defendant testified that, after he was placed in handcuffs,

one of the officers grabbed [his] arm in a [sic] unusual way and put force upon [him] to the point where it felt like it was about to be broken. And said, you had better be telling me the truth; you – you better give this officer over here everything – the detective everything he wants to know about what's going on.

16

And [he] was – [he] never walked over to the police cruiser, [he] was practically drug [sic] over there while [he] was still being subdued in this same manner.

The Defendant also testified as follows about what happened with the detective:

Once I had contact with the detective he immediately started asking me questions about the other person. He asked me questions about the crime and he also made – he made several threats about what I would – like you – you're in very serious trouble. And I said, what do you mean I'm in very serious trouble. He said, I can put a lot of charges on you and I can make your life real hard and I can put you away for life.

And I'm like, what do you mean you can put me away for life. He said, exactly what I just said. And he – he said this to me while I was in the patrol car before he Mirandized me.

The Defendant testified that the detective did not "Mirandize" him until after he was questioned. The Defendant stated that he answered questions because he was "scared" and "didn't want [the detective] to hurt" him. The Defendant testified that the detective's presence standing at the patrol car while the Defendant was seated inside was "very aggressive" and that the detective pushed him "at least one time."

The Defendant testified that, after he arrived at the station, he told an officer that he "needed an ambulance because [his] heart was racing and it would not stop." The officer responded, "[N]o, you're not getting anything until you talk to the detective." The Defendant's request to go to the bathroom also was refused.

The Defendant stated that, once the detective arrived, and prior to the detective's giving him his Miranda rights, the detective

went over several times what happened during the crime. And if I said something that he didn't like, he would get angry and he would just keep asking me over and over and over and over again. And then it's like he was making me – trying to get me to say things.

Like I told him that I didn't hit the manager in the head. I said, I didn't hit him. And he said, he said, yes, you did, you did hit the manager. And I said, no, I did not hit the manager.

17

He said, well, how – how did he get this big bruise on his head. I said, I don't know what you're talking about. And he kept doing this over and over again.

And for some reason I just said, well, if you said I did it, then I guess I accidentally did it then.

The Defendant affirmed that "all this was done prior to the Miranda warnings that were done on the tape."

Asked about his physical and mental health on the day of the offenses, the Defendant responded,

The day that this happened I was – I couldn't function properly. My thoughts were racing and I couldn't answer questions in a way to where I can say that I was fully thinking about them. It was just whatever was popping in my head, that's what I was saying to him. And my heart was beating fast as it had always been. I couldn't – I never could stop sweating. My eyes were always bothering me because – the disease bothers my vision or it bothers my eyes and other things that – like the hallucinations. The hallucinations always occur. They got worse, and worse and worse, even up to this date.

And that day I can't recall exactly if I had a hallucination but I know I hadn't slept. I hadn't slept.

The Defendant added that he had taken Xanax that day.

On cross-examination, the Defendant testified that the policeman who accompanied him to the patrol car after he was handcuffed was pulling his arms up and caused him pain. This same officer told him to answer the detective's questions "or I'll break your arm." The Defendant reiterated that Det. Stokes then threatened him and pushed him on his shoulder, all before giving the Defendant his <u>Miranda</u> rights. The Defendant admitted to later providing information on other robberies in which the codefendant was involved. He did this because Det. Stokes told him that, if he provided such information, "he wouldn't put me away for the rest of my life. . . and also that he would only seek one charge against me and that would be all I got."

Called in rebuttal, Officer Ragan denied pulling the Defendant's arms after handcuffing him and denied threatening to break his arm. Also called in rebuttal, Det. Stokes denied pushing the Defendant, denied threatening to put the Defendant "away" for life, and

18

denied telling the Defendant that he was going to make his life hard. Det. Stokes added that, during their conversation at the patrol car, "[t]here wasn't any aggressive questioning or any belligerent answering whatsoever. He was very cooperative."

After taking the foregoing under advisement, the trial court denied the Defendant's motion to suppress. The record before us contains neither findings of fact nor conclusions of law in support of the trial court's ruling. As the above summary makes clear, however, the trial court had before it proof of two different versions of what occurred during and after the police took the Defendant into custody. The trial court's ruling indicates that the trial court rejected the Defendant's version and accredited the State's version. That is, the trial court's ruling indicates that it found the Defendant's testimony not credible. The trial court's ruling also implies that it found Dr. Smith's testimony insufficient to demonstrate that the Defendant was unable to execute a valid waiver of his constitutional rights prior to making a statement.

When this Court reviews a trial court's denial of a defendant's motion to suppress, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). We are bound by the trial court's (implied) findings of fact unless the evidence in the record preponderates against them. Id. Moreover, because the State prevailed in the trial court, it "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." Id. We review the trial court's application of the law to the facts de novo, however, with no presumption of correctness. State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (citing State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001)).

The proof, as accredited by the trial court, established that the Defendant had two verbal interactions with the police prior to being given his Miranda warnings. First, as he was being taken into custody, one of the officers asked the Defendant where the gun was. The Defendant responded that he did not have it. Second, as the Defendant was being escorted to the patrol car, Sgt. Teague told him to cooperate with the detective and to answer the detective's questions.

As a general rule, the statements a defendant makes in response to custodial interrogation are not admissible at trial unless preceded by the warnings mandated in Miranda v. Arizona, 384 U.S. 436, 478-79 (1966), and a waiver thereof. See State v. Climer, 400 S.W.3d 537, 557 (Tenn. 2013). "Interrogation 'refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an

incriminating response from the suspect.'" State v. Sawyer, 156 S.W.3d 531, 534 (Tenn. 2005) (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)). Both the officer's question to the Defendant about the location of the gun and Sgt. Teague's subsequent admonition to answer the detective's questions were instances of interrogation conducted while the Defendant was in custody and prior to being given his Miranda warnings.

Therefore, we must determine whether the Defendant's response to the query about the location of the gun should have been suppressed. We hold that the trial court committed no error in not suppressing the Defendant's statement that the gun was not in his possession. The United States Supreme Court has recognized that custodial interrogation necessary to secure an officer's safety or the public's safety need not be preceded by the Miranda warnings. See New York v. Quarles, 467 U.S. 649, 657-59 (1984). In the instant case, the police knew that a gun had been utilized in the Shoney's incident. Accordingly, the officers taking the Defendant into custody were entitled to ask him, prior to administering Miranda warnings, about the location of the gun. See State v. Ricky Ronald Crawford, No. E2005-02018-CCA-R3-CD, 2007 WL 283141, at *8 (Tenn. Crim. App. Feb. 1, 2007), perm. app. denied (Tenn. May 21, 2007). The Defendant is entitled to no relief on this basis.

We next must determine whether Sgt. Teague's admonition to the Defendant, made prior to the Defendant receiving his Miranda warnings, rendered inadmissible the Defendant's later statements, which were made after the Defendant received his Miranda warnings and after he waived his rights against self-incrimination and to the assistance of a lawyer. That is, did Sgt. Teague's pre-Miranda admonition render involuntary the Defendant's subsequent waiver of his constitutional rights? See Moran v. Burbine, 475 U.S. 412, 421 (1986) (holding that a suspect's waiver of his Miranda rights "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception"). We hold that it did not.

This Court looks to "the totality of the circumstances" when determining whether a defendant validly waived his Miranda rights. See State v. Thacker, 164 S.W.3d 208, appx. 248 (Tenn. 2005) (citing State v. Stephenson, 878 S.W.2d 530, 545 (Tenn. 1994)). We reiterate that the trial court impliedly accredited Det. Stokes' testimony over the Defendant's in determining what happened at the scene of the Defendant's apprehension. The record reflects that, although Det. Stokes acknowledged that Sgt. Teague told the Defendant that he should tell the detective everything the detective wanted to know, the Defendant already had indicated his willingness to cooperate. The Defendant did not resist being taken into custody and responded truthfully to Officer Ragan's query about the gun. Det. Stokes stated that the Defendant "walked" to the patrol car while being escorted by Officer Ragan and Sgt. Teague and that there was "[n]othing [he] would describe as aggressive" about this encounter. Det. Stokes testified that, after the Defendant was in the patrol car and after Det. Stokes advised

20

him of his rights, the Defendant "did indicate to me that he understood his rights because I asked him if he understood his rights. And said – he said he wanted to speak with me about it at that point." Det. Stokes denied that Sgt. Teague's remark to the Defendant was a "threat."

We hold that the Defendant has failed to establish that the proof preponderates against the trial court's implied determination that he validly waived his <u>Miranda</u> rights. Accordingly, the Defendant is entitled to no relief on this basis.

*Trial Court's Refusal to Disqualify District Attorney General*

The offenses in this case were committed in May 2009. The Defendant was indicted in October 2009. On August 5, 2011, the Defendant, acting pro se, filed a civil complaint in federal court naming as defendants the Davidson County District Attorney General and others in his office, including the assistant district attorney general who prosecuted this case; one of the Davidson County criminal court judges; the Tennessee Department of Correction; and others. In this civil lawsuit ("the Lawsuit"), the Defendant sought monetary damages on the basis that he was unlawfully incarcerated on an unrelated case.

On October 24, 2011, days before the Defendant's trial in this matter was scheduled to commence, the defense filed a pleading[5] styled "Motion to Disqualify Davidson County District Attorney Victor S. (Torry) Johnson III, Assistant District Attorney Rachel Marie Sobrero, and/or the Davidson County District Attorney's Office Due to a Conflict of Interest and/or a Strong Appearance Thereof." This motion references the Lawsuit and provides as follows:

> Although the suit relates to the cases of which [the Defendant] was previously over incarcerated such further relates significantly to the present criminal cases against [the Defendant] as such raises claims against the above due to their claimed concerted actions of having interfered with, hindered and prevented the hearing of [the Defendant's] motion and other attempts at securing his release, from over incarceration, in order to, among other things, gain a tactical advantage in the present case including but not limited to preventing him from being able to secure his release in order that he might assist substantially in investigating and preparing an aggressive defense, in order to interfere with his preparation thereof, and further to have him serve

---

[5] Defense counsel signed this pleading but followed his signature with the notation "drafted by Jerome Teats."

as much time as possible on said present charges even absent any judicial determination of guilt thereon.

The trial court conducted a hearing on this motion on October 27, 2011. The defense put on no proof. The trial court denied the motion, stating from the bench that

there is no proof either that anyone in the district attorney's office has done anything unethical or is doing anything unethical by pursuing [the Defendant] on this aggravated robbery and kidnapping case. . . . And there is no indication here that I've heard of, and there's been no proof that the DA or the assistant DA would not act impartially and responsibly in this case.

This Court reviews a trial court's decision on a motion to disqualify a prosecutor for an abuse of discretion. State v. Coulter, 67 S.W.3d 3, 28 (Tenn. Crim. App. 2001) (citations omitted), abrogated on other grounds by State v. Merriman, 410 S.W.3d 779, 793 (Tenn. 2013).

We discern no abuse of discretion here. The Defendant argues in his brief to this Court that

[t]he causes of action filed in the [L]awsuit established an actual conflict for the District Attorney to prosecute [this] case. The actual conflict in this matter mandated disqualification of the entire District Attorney's staff. [The Defendant] filed a written Motion to Disqualify the District Attorney and his staff because they had a conflict of interest or appearance of impropriety to prosecute [this] case.

In other words, the Defendant is claiming that his motion should have been granted because the Lawsuit, filed weeks before his trial was to begin, created a conflict of interest and/or appearance of impropriety in the prosecutors' pursuit of the instant case.

We agree with the State that a criminal defendant cannot create a conflict of interest (or an appearance of impropriety) requiring the disqualification of a prosecutor's office simply by filing a federal lawsuit against the office and its members. We emphasize that the Defendant put on absolutely no proof of any such conflict of interest or appearance of impropriety other than a copy of the Lawsuit. This issue being devoid of any merit, the Defendant is entitled to no relief on this basis.

22

The jury convicted the Defendant of four counts of especially aggravated kidnapping resulting from the confinement of victims Perez, Ruiz, Moreno, and Teresa in the back hallway area of the Shoney's while the Defendant robbed the manager. The Defendant contends that these convictions cannot stand because they violate his due process rights; violate his rights against double jeopardy; and were based on improper jury instructions. We will address each of these contentions in turn.

## Due Process

In 1991, the Tennessee Supreme Court considered in a consolidated appeal two unrelated cases in which each of the two defendants committed an armed robbery of a business. See State v. Anthony, 817 S.W.2d 299, 300 (Tenn. 1991). In the first case, the defendant (Anthony) and his cohort committed an armed robbery of a Shoney's restaurant in Knoxville, Tennessee. When the two men approached the restaurant, they found three employees outside near the dumpster. Anthony, who was armed, ordered the employees to the ground and left his cohort to watch over them. Anthony entered the restaurant and encountered two more employees. At gunpoint, he ordered them to open the safe, which involved all three of them walking to the office. One of the employees told Anthony that the safe was elsewhere, resulting in Anthony ordering her to stay in the office while he and the other employee (Kesterson) proceeded to the safe. On his way out of the restaurant, Anthony encountered yet another employee, whom Anthony ordered, at gunpoint, to return to the restroom and stay there. Anthony was subsequently convicted by a jury of the armed robbery of Kesterson and the aggravated kidnappings of Kesterson and the other five employees. See id. at 301.

In the second case, the defendant (Martin) entered an insurance agency while armed. Martin encountered the owner and a secretary. Martin told the owner to lie on the floor and obtained cash from him. Martin also took the agency's money from the secretary as well as some cash from her wallet. Martin then took the owner by the arm and ordered both persons into the men's restroom, telling them to stay there. Martin then fled. Martin subsequently was convicted of two counts of armed robbery (one as to each victim) and two counts of aggravated kidnapping (one as to each victim). See id. at 302.

On review, our supreme court framed the issue as "the propriety of a kidnapping conviction where detention of the victim is merely incidental to the commission of another felony, such as robbery or rape." Id. at 300. The court held that none of the kidnapping convictions could be sustained on the basis that the dual convictions offended Tennessee's constitutional guarantee of due process. Id. at 306, 307. Our high court articulated the

appropriate test, to be applied by the appellate courts on review, as follows: "whether the confinement, movement, or detention is essentially incidental to the accompanying felony and is not, therefore, sufficient to support a separate conviction for kidnapping, or whether it is significant enough, in and of itself, to warrant independent prosecution and is, therefore, sufficient to support such a conviction." Id. at 306.

Our supreme court later modified this test in State v. Dixon, 957 S.W.2d 532, 535 (Tenn. 1997). See State v. Richardson, 251 S.W.3d 438, 443 (Tenn. 1008) (explicitly recognizing that the test set forth in Dixon replaced the Anthony test). In Dixon, the court described Anthony's "essentially incidental" test as designed to "only prevent the injustice which would occur if a defendant could be convicted of kidnapping where the only restraint utilized was that necessary to complete the act of rape or robbery." 957 S.W.2d at 534-35. The Dixon court added that "any restraint in addition to that which is necessary to consummate rape or robbery may support a separate conviction for kidnapping." Id. at 535. The new test set forth in Dixon consisted of two prongs: (1) whether the defendant's movement or confinement of the victim was beyond that necessary to consummate the accompanying felony, and, if so, (2) whether the additional movement or confinement prevented the victim from summoning assistance, lessened the defendant's risk of detection, or created a significant danger or increased the victim's risk of harm. Id. If each prong was satisfied, a separate kidnapping conviction would be sustained. Dixon involved a single victim, and the defendant was convicted of aggravated kidnapping, aggravated assault, and attempted sexual battery. Id. at 533. The supreme court affirmed the defendant's convictions. Id. at 532.

In 2012, the Tennessee Supreme Court overruled Anthony and its progeny, including Dixon and Richardson, in State v. White, 362 S.W.3d 559, 578 (Tenn. 2012). In White, the defendant was convicted of burglary, aggravated robbery, and especially aggravated kidnapping arising from the defendant's robbery of a Clarksville restaurant. Significantly, the victim of the robbery and kidnapping offenses was a single individual. In analyzing whether the defendant's dual convictions for aggravated robbery and especially aggravated kidnapping could stand, White rejected Anthony's reliance on an appellate court's due process scrutiny of kidnapping convictions imposed in conjunction with convictions of an accompanying felony. Id. at 577-78. Instead, the White court shifted the appellate analysis to a standard sufficiency of the evidence review of a *properly instructed* jury's assessment of the facts. Id. The White court emphasized that it was the *jury's* "primary obligation . . . to ensure that a criminal defendant has been afforded due process." Id. at 577. A jury does so by assessing the proof at trial and determining whether the State has met its burden of proving each and every element of the charged offenses beyond a reasonable doubt. Id. at 577-78.

24

To ensure that the jury can carry out its function of protecting a defendant's due process rights when considering whether the State has proven each and every element of a kidnapping charge that arises out of the same conduct against the same victim of an accompanying felony, the White court delineated the following jury instruction:

> To establish whether the defendant's removal or confinement of *the victim* constituted a substantial interference with his or her liberty, the State must prove that the removal or confinement was to a greater degree than that necessary to commit the offense of [insert offense], which is the other offense charged in this case. In making this determination, you may consider all the relevant facts and circumstances of the case, including, but not limited to, the following factors:
>
> > • the nature and duration of *the victim's* removal or confinement by the defendant;
> >
> > • whether the removal or confinement occurred during the commission of the separate offense;
> >
> > • whether the interference with *the victim's* liberty was inherent in the nature of the separate offense;
> >
> > • whether the removal or confinement prevented *the victim* from summoning assistance, although the defendant need not have succeeded in preventing *the victim* from doing so;
> >
> > • whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective; and
> >
> > • whether the removal or confinement created a significant danger or increased *the victim's* risk of harm independent of that posed by the separate offense.

Id. at 580-81 (footnote omitted) (emphases added). This instruction appears to have been drafted with the assumption that the defendant is being tried for dual offenses against a single victim. Certainly, that was the factual scenario before the court in the case.

25

Logic dictates that, if the court intended the instruction to be required in cases involving circumstances similar to the instant case, the court would have phrased the instruction as "the victim *of the underlying felony*." The court obviously chose not to do so.

We also note that the White court relied on the Connecticut Supreme Court decision, State v. Salamon, 949 A.2d 1092 (Conn. 2008). See White, 362 S.W.3d at 579. Salamon involved offenses against a single victim. See Salamon, 949 A.2d at 1101-02. Indeed, the White court noted that the Salamon court "clarified that the jury was to be instructed that 'if it finds that the defendant's restraint of *the victim* was merely incidental to the defendant's commission of another crime against *the victim*, that is, assault, then it must find the defendant not guilty of the crime of kidnapping.'" White, 362 S.W.3d at 579 n.15 (quoting Salamon, 949 A.2d at 1122) (emphases added).

The core issue of Anthony, Dixon, and White was whether the defendant's actions in moving and/or detaining his victim(s) was no more than was necessary to commit the robbery of the business establishment. See Anthony, 817 S.W.2d at 306 (holding that one method of resolving whether the confinement, movement, or detention required for a kidnapping offense was essentially incidental to the accompanying felony was to determine whether the defendant's conduct increased the victim's risk of harm beyond that *necessarily* present in the accompanying felony); Dixon, 957 S.W.2d at 535 (recognizing that "any restraint in addition to that which is *necessary* to consummate [the accompanying felony] may support a separate conviction for kidnapping") (emphasis added); White, 362 S.W.3d at 576-77 ("In our view, the kidnapping statutes, 'construed according to the fair import of their terms,' Tenn. Code Ann. § 39-11-104, and coupled with their derivation from the Model Penal Code, evince a legislative intent to punish as kidnapping only those instances in which the removal or confinement has criminal significance above and beyond that *necessary* to consummate some underlying offense, such as robbery or rape.") (emphasis added). See also Salamon, 949 A.2d at 1120 (recognizing that "the guiding principle is whether the [confinement or movement] was so much the part of another substantive crime that the substantive crime could not have been committed without such acts") (internal quotation marks omitted) (citation omitted). The underlying concerns were that a perpetrator, by necessity, must detain his robbery victim long enough to commit the taking of property from the victim[6] and that principles of due process prohibit the imposition of a separate kidnapping conviction when the detention is no more than that required to commit the robbery.[7]

---

[6] Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (2006).

[7] The Anthony court relied on principles of due process after concluding that a double jeopardy
(continued...)

26

This case presents a significantly different situation than the situation which triggered the underlying concerns the court articulated in Anthony. In this case, the Defendant was *not* convicted of both aggravated robbery and especially aggravated kidnapping as to any single victim. Rather, contrary to both Anthony and White, the State sought and obtained only one conviction as to each victim: the aggravated robbery as to the manager and the especially aggravated kidnapping as to each of the employees moved to, and detained in, the hallway/storage area of the restaurant. While we recognize that our supreme court has determined that it is unfair to convict a defendant of two crimes against a single victim when he, in fact, arguably has committed only a single crime that, *by necessity*, includes an element of a different crime, that same concern eludes us in the face of multiple victims for which a defendant is charged with a single offense. That is, we acknowledge that a perpetrator, by some means or other, must detain his robbery victim long enough to take some property from her. However, there is no corresponding *necessity* for the perpetrator to immobilize innocent bystanders. Certainly, immobilizing such persons may facilitate the perpetrator's commission of his intended crime against his intended robbery victim, but we do not agree that principles of due process prevent the perpetrator from being prosecuted for the separate crimes he may commit against bystanders in order to facilitate his primary crime. Indeed, we fail to see how a crime against one person can be merely "incidental" to a crime against another person.[8]

Thus, we are persuaded that the robbery of a business establishment in which multiple persons are present does not expand a perpetrator's due process protections such that he is free to move and/or detain *multiple* persons in order to commit a *single* robbery without facing kidnapping convictions, at least as to those victims against whom he cannot be charged with robbery.[9]

We recognize, of course, that our conclusion, in some respects, is contrary to our supreme court's holdings in Anthony. However, the issue we address today was not presented to the Anthony court. Moreover, our current supreme court wisely has overruled

---

[7](...continued)
analysis was not adequate to resolve the issue. See Anthony, 817 S.W.2d at 306.

[8] This is particularly the case when the "incidental" crime consists of the terrifying experience of being detained in a separate location at gunpoint.

[9] In State v. Franklin, this Court determined that "the proper unit of prosecution for aggravated robbery in Tennessee is the number of thefts rather than the number of victims." 130 S.W.3d 789, 798 (Tenn. Crim. App. 2003). Accordingly, the Franklin court held that, when the evidence establishes only a single taking of property even though more than one person was present, only one conviction of aggravated robbery may be sustained. Id.

27

Anthony, and we no longer are bound by its expansive application of due process which has been utilized to defeat kidnapping convictions of perpetrators who commit offenses against separate persons to facilitate the robbery of an entirely different victim.

As the logical correlate of our conclusion about the limits of the Defendant's due process protections, we hold that the Defendant in this case was not entitled to the White instruction.[10] We read White as requiring the expanded kidnapping instruction only when the jury is required to determine whether the defendant committed dual offenses of kidnapping and an accompanying crime for which some measure of detention was necessary *against the same victim*.[11] In the instant case, the jury was not asked to make this determination. Because the State did not seek dual convictions as to any single victim, the trial court did not err in failing to include the White instruction[12] in its charge to the jury.

We acknowledge that panels of this Court have reached differing conclusions on this issue. For instance, in State v. Richard Lacardo Elliott, No. M2001-01990-CCA-R3-CD, 2002 WL 31528538, at *1 (Tenn. Crim. App. Nov. 15, 2002), perm. app. denied (Tenn. Feb. 24, 2003), a panel of this Court, even prior to White, considered the defendant's convictions of aggravated robbery and aggravated kidnapping as to separate victims arising out of the defendant's conduct in a liquor store. Initially, the defendant began a transaction with the clerk. When a customer walked in, the defendant produced a gun and ordered the customer to the floor at gunpoint. The defendant returned his attention to the clerk and ordered the clerk to give him money. After the clerk complied, the defendant ordered both persons to a storage area in the rear of the store and "warned them not to move from that location for five or ten minutes." Id. The defendant was convicted of the aggravated kidnapping of the customer and of the aggravated robbery of the clerk. The panel rebuffed the defendant's Anthony challenge in what appears to be the first case that specifically addressed the precise issue before this Court in the instant case.

---

[10] The Defendant's trial was held in November 2011, before the White decision was filed. Cases in the appellate "pipeline" at the time White was released may, nevertheless, be remanded for retrial with a White instruction if the reviewing court determines that the pre-White jury instruction was not harmless beyond a reasonable doubt. See State v. Cecil, 409 S.W.3d 599, 608, 610 (Tenn. 2013).

[11] Rape, for instance, necessarily involves some detention of the victim by the defendant. See State v. Michael Eugene Duff, No. 03C01-9501-CR-00008, 1996 WL 49250, at *5 (Tenn. Crim. App. Feb. 8, 1996) (recognizing that "confinement and detention are necessarily part of rape"), perm. app. denied (Tenn. July 8, 1996).

[12] As suggested by the White court, the Tennessee Judicial Conference Committee on Pattern Criminal Jury Instructions adopted a permanent pattern instruction based on White. See T.P.I. - Crim. 8.03 (17th ed. 2013). The pattern jury instruction is basically identical to the instruction set forth in White.

The Elliott court opined as follows:

> We believe that the kidnapping of [the customer] . . . had nothing to do with the robbery of [the clerk]. . . . Defendant did not rob the victim of the aggravated kidnapping, [the customer], nor was he charged with that offense. Rather, he was charged with the aggravated robbery of [the clerk] and the aggravated kidnapping of [the customer]. As the supreme court stated in Anthony, "[t]he real issue involves the propriety of a kidnapping conviction where detention of the victim is merely incidental to the commission of another felony, such as robbery or rape." 817 S.W.2d at 300. In this case, the question is whether the detention of [the customer] was merely incidental to the aggravated robbery of [the clerk].
>
> . . . .
>
> Here, rather than leaving the store, Defendant ordered [the customer] at gunpoint to a storage area in the back of the store after the aggravated robbery of [the clerk] was complete. Therefore, the aggravated kidnapping of [the customer] was not incidental to the aggravated robbery of [the clerk]. *We believe, however, that when the robbery victim and the kidnapping victim are two different persons, the issue is better characterized as a question of whether sufficient evidence exists to sustain a conviction for aggravated kidnapping.*

Id. at *3-4 (emphasis added). The panel concluded that the evidence was sufficient to support the defendant's conviction of the aggravated kidnapping of the customer. Id. at *4. See also State v. Gregory Mathis, No. M2011-01096-CCA-R3-CD, 2013 WL 4774130, at *9 (Tenn. Crim. App. Sept. 5, 2013) (rejecting due process challenge to especially aggravated kidnapping conviction because victim was not a victim of the accompanying aggravated robbery of boyfriend, holding that "the especially aggravated kidnapping conviction . . . was a separate and distinct offense from the aggravated robbery").

In contrast, a majority of a different panel in State v. Josh L. Bowman, No. E2012-00923-CCA-R3-CD, 2013 WL 4680402 (Tenn. Crim. App. Aug. 29, 2013), disagreed with the Elliott case. Id. at *14-15. In Bowman, the panel considered a home invasion case in which the defendant and his cohort accosted a couple in their home and shot and killed the husband. The men then made off with the couple's safe. During the episode, one of the men held a gun to the wife's head and ordered her to sit down. The defendant was convicted of the especially aggravated kidnapping of the wife and the especially aggravated robbery of the husband, as well as other convictions not relevant to the issue before us. The defendant argued that he was entitled to a new trial because the jury was not given the White

29

instruction. The State argued that White did not apply because the charges for especially aggravated kidnapping and especially aggravated robbery involved different victims. Id. at *14. The majority of the panel rejected the State's argument, predicated on Elliot, noting that "[o]ur supreme court never said in the Anthony/Dixon/White line of cases that the fact that the victim of the kidnapping was different than the named victim of the accompanying felony eliminated the need for due process analysis." Id. at *15.

A dissenting opinion filed in Bowman reasoned as follows:

> The kidnapping offenses found in chapter 13 of Title 39, Part 3 of Tennessee Code Annotated and the robbery offenses found in the same chapter and title, but in Part 4 are both classified by our legislature as offenses against the person of another. The two distinct offenses of especially aggravated kidnapping of [the wife] and the especially aggravated robbery of [the husband] are not "accompanying" felonies to each other, even though they did occur at virtually the same time and in the same house. No robbery of [the wife] accompanied the especially aggravated kidnapping of [the wife]. No kidnapping offense of [the husband] accompanied the especially aggravated robbery of [the husband]. As there was no "accompanying felony" to the especially aggravated kidnapping charge, there was no need for the additional jury instruction set forth in White.

Id. at *17. (Woodall, J., dissenting).

The majority opinion in Bowman also relied upon this Court's opinion in State v. Michael L. Powell, No. E2011-00155-CCA-R3-CD, 2012 WL 1655279 (Tenn. Crim. App. May 10, 2012). We respectfully disagree with the Bowman court's analysis of Powell. Powell involved a home invasion in which the two defendants and a third man accosted three people. The defendants were charged with aggravated robbery as to each of the three people and with especially aggravated kidnapping as to two of the people. The jury convicted the defendants as charged, and the defendants raised an Anthony challenge on direct appeal. In the meantime, our supreme court issued its decision in White. The Powell court framed the issue as follows:

> In the instant case, the proof in support of the Defendants' especially aggravated kidnapping convictions consists of [victim 1's] testimony that, after [the defendant] Powell and the third man (Sean) took property from [victim 1 and victim 2] in the immediate vicinity of [victim 3's] bedroom, Powell, accompanied by Sean, forced [victim 1 and victim 2] into the kitchen at gunpoint, made them lie down, and ordered them to remain there. The proof

30

also established, however, that [victim 1] had tried to stop the robbery of [victim 3] and that [the defendant] Horne remained with [victim 3] while Powell and Sean forced [victim 1 and victim 2] into another room. Therefore, the proof is susceptible of at least two interpretations: (1) that Powell and Sean removed [victim 1 and victim 2] from the scene of the robberies as discrete criminal activity after the robberies had been completed, or (2) that Powell and Sean were separating [victim 1 and victim 2] from [victim 3] so that Horne could proceed with the robbery of [victim 3] without further interference. Accordingly, the determination of whether the removal or confinement of [victim 1 and/or victim 2] constituted a substantial interference of either victim's liberty that was to a greater degree than necessary to commit the aggravated robbery of [victim 3] was a question of fact for the jury to resolve.

Id. at *9. Accordingly, the unanimous Powell panel remanded the matter for a new trial on the kidnapping charges requiring inclusion of the White instruction. Id.

This case presents a different scenario. The Defendant was not charged with dual crimes against any of the victims. Indeed, the Defendant was charged with and convicted of committing only a single robbery against a single victim. Likewise, the Defendant's kidnapping convictions arose out of the moving and detaining of *other* persons, from whom the Defendant took nothing. The moving and detention of these *other* persons were not *necessary* to the Defendant's commission of the robbery of the manager.

For these reasons, we hold that the Defendant's due process rights were not violated by his convictions and that he was not entitled to the White instruction. Accordingly, the Defendant is not entitled to relief on either of these bases.

## Double Jeopardy

Other than referring to two Tennessee appellate decisions from the 1970s reflecting the authors' concerns with the proliferation of penal statutes, the Defendant makes no argument, and makes no references to the record, in support of his allegation that his convictions for especially aggravated kidnapping and aggravated robbery offend the federal and state constitutional prohibitions against double jeopardy. Accordingly, this issue is waived. See Tenn. Ct. Crim. App. R. 10(b).[13]

_____

[13] Indeed, if we were to address this issue on the merits, we note that federal courts expressly have rejected Fifth Amendment double jeopardy attacks on dual convictions for kidnapping and an accompanying felony. See, e.g. Spence v. Sheets, 675 F.Supp. 792, 824 (S.D. Ohio 2009) (rejecting Fifth Amendment
(continued...)

31

Jury Instruction

In this case, the Defendant requested, in writing, that the trial court instruct the jury as follows:

> In order for the jury to find the Defendant guilty of Especially Aggravated Kidnapping, [Aggravated Kidnapping, Kidnapping or attempt to commit any of the kidnapping offenses], the prosecution must prove that the detention or confinement of the victims was not incidental to the underlying felony of Aggravated Robbery, [Robbery or any Attempt to Commit Robbery]. The prosecution must prove that the confinement or movement was beyond that necessary to consummate the crimes of Aggravated Robbery, [Robbery or Attempt to Commit Robbery].
>
> If the prosecution has proved beyond a reasonable doubt that the detention or confinement of the victims was not incidental to the underlying felony offense of Aggravated Robbery, [Robbery or Attempt to Commit Robbery], then you must find that the prosecution has proved beyond a reasonable doubt one of that [sic] the detention or confinement:
>
> (1) Prevented the victim from summoning help;
>
> (2) Lessened the Defendant's risk of detection; or
>
> (3) Created a significant danger or increased the victim's risk of harm.

---

[13](...continued)

double jeopardy challenge to dual convictions of aggravated robbery and aggravated kidnapping imposed in Ohio state court); Bias v. Ieyoub, 36 F.3d 479, 480-81 (5th Cir. 1994) (rejecting Fifth Amendment double jeopardy challenge to dual convictions for aggravated rape and aggravated kidnapping imposed in Louisiana state court). Moreover, as Anthony made clear, the Tennessee Constitution's double jeopardy clause does not provide an avenue of relief. Anthony, 817 S.W.2d at 306, overruled on other grounds by White, 362 S.W.3d at 578. Thus, only because our supreme court determined in Anthony that the Tennessee Constitution provided broader due process protections than were afforded by double jeopardy principles do we need to address the viability of the Defendant's convictions for especially aggravated kidnapping. Apparently, in White and Cecil, our supreme court did not see fit to simplify the analysis under our state constitution to address these issues solely on the basis of double jeopardy.

The trial court denied the Defendant's request and charged the jury with the standard jury instruction for especially aggravated kidnapping. The Defendant contends that the trial court's ruling was reversible error.[14]

We disagree. The essence of the Defendant's argument is that he was urging the trial court to utilize a White-type jury instruction even before the decision in White had been handed down. As set forth above, however, we have determined that no White instruction was necessary in this case. Accordingly, the trial court committed no error in denying the Defendant's request. The Defendant is entitled to no relief on this basis.

*Sufficiency of the Evidence*

The Defendant contends that the evidence was not sufficient to support his convictions of especially aggravated kidnapping. Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellate court does not weigh the evidence anew; rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

Especially aggravated kidnapping is defined as "false imprisonment . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." Tenn. Code Ann. § 39-13-

---

[14] We recognize that the proposed special instruction is substantially similar to the White instruction.

33

305(a)(1) (2006). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Id. § 39-13-302(a) (2006). Additionally, "[a] person is criminally responsible for an offense committed by the conduct of another, if . . . [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Id. § 39-11-402(2) (2006).

Taken in the light most favorable to the State, the proof in this case demonstrated that the Defendant and the codefendant walked into the back door of the Shoney's when it was opened from the inside by an employee. Brandishing handguns, the two men rounded up four of the restaurant's employees and ordered them into a back hallway/storage area. While the codefendant stood guard over the confined employees, the Defendant accosted the manager at gunpoint. The Defendant took the manager into the area with the cash register, and the manager emptied the money into a plastic bag. The Defendant then took the manager to the area where the other employees were being held. Someone said, "bow down," and all of the employees got down on the floor. The Defendant and the codefendant then left. The four named kidnapping victims were confined for a total of about eight minutes.

This proof established that the Defendant and the codefendant knowingly and unlawfully confined the Shoney's employees, Perez, Ruiz, Moreno, and Teresa, so as to interfere substantially with their liberty. Additionally, the Defendant and the codefendant accomplished these actions with handguns. The evidence also established that the two men were acting as a team, such that each was criminally responsible for the criminal actions of the other. See Tenn. Code Ann. § 39-11-402(2) (2006). Accordingly, we hold that the proof was sufficient to support the Defendant's four convictions of especially aggravated kidnapping. The Defendant is entitled to no relief on this basis.

*Jury Instruction on Criminal Responsibility*

In addition to charging the jury that "[t]he defendant is criminally responsible for an offense committed by the conduct of another if, acting with the intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the defendant solicit(s), direct(s), aid(s), or attempt(s) to aid another person to commit the offense," the trial court instructed the jury as follows:

> A defendant who is criminally responsible for an offense may be found guilty not only of that offense, but also for any other offense or offenses committed by another, if you find beyond a reasonable doubt that the other offense or offenses committed were natural and probable consequences of the

34

original offense for which the defendant is found criminally responsible, and that the elements of the other offense or offenses that accompanied the original offense have been proven beyond a reasonable doubt.

Before you find the defendant guilty of being criminally responsible for said offense(s) committed by the conduct of another, you must find that all the essential elements of said offense(s) have been proven by the state beyond a reasonable doubt.

This instruction was identical to the instruction found in the Tennessee Criminal Pattern Jury Instructions. See T.P.I. - 3.01 (15th ed. 2011). This Court previously has described pattern instruction 3.01 as "a correct statement of the law." State v. Mario Green, No. W2006-01383-CCA-R3-CD, 2008 WL 2331020, at *7 (Tenn. Crim. App. June 5, 2008).

The Defendant argues that the trial court's instructions violated his constitutional right to a unanimous jury verdict because these instructions permitted some of the jurors to conclude that he was "guilty of kidnapping because it is a natural and probable consequence of robbery without consideration of criminal responsibility for the co-defendant's actions," while other jurors may have concluded that he was guilty of kidnapping "under the theory of criminal responsibility for the co-defendant's conduct of rounding up and holding the Shoney employees," while yet other jurors may have concluded that he was guilty of kidnapping through a "combination of both scenarios."

The Defendant has cited no authority for the proposition that a criminal responsibility instruction combined with a natural and probable consequences instruction threatens a defendant's right to a unanimous verdict. We think this issue more properly is framed as whether the trial court erred in providing the jury with alternative theories as to how the Defendant committed each individually charged crime. We hold that it did not.

Concerns with jury unanimity generally occur when, for instance, the defendant is charged with a single criminal act but the victim testifies about three specific criminal acts. The State, in that event, is required to elect which specific criminal act it wants the jury to consider so as to ensure that the jury reaches a unanimous verdict as to that specific act. Otherwise, there is a danger that some of the jurors would be voting to convict on the first specific act, while others would be voting to convict on the second specific act, while yet others would be voting to convict on the third specific act. Such a "patchwork verdict" runs afoul of Tennessee's constitutional requirement of a unanimous jury verdict as to each crime charged. See generally State v. Shelton, 851 S.W.2d 134, 137 (Tenn. 1993).

In this case, the Defendant was charged with four counts of especially aggravated kidnapping, each involving a separate victim. There was proof of only a single especially aggravated kidnapping committed against each victim. That the proof may have included alternative *theories* as to how the Defendant committed each offense did not threaten the Defendant's right to a unanimous verdict as to each count. See State v. James Clayton Young, Jr., No. 01C01-9605-CC-00208, 1998 WL 258466, at *5 n.4 (Tenn. Crim. App. May 22, 1998) ("Generally, alternative theories, mental states, modes of committing the crime, or means by which the crime was committed may be submitted to the jury without the necessity of precautions to assure jury unanimity.") (citations omitted); see also State v. Lemacks, 996 S.W.2d 166, 170-71 (Tenn. 1999) (holding jury unanimity not at risk where jury was instructed that it could find defendant guilty of DUI either directly or via criminal responsibility for the actions of another). Accordingly, the Defendant is entitled to no relief on this issue.

*Cumulative Error*

In his penultimate issue, the Defendant contends that he is entitled to a new trial on the basis of cumulative error. As set forth above, however, we have determined that the trial court committed no errors in conjunction with the issues raised by the Defendant. Accordingly, the Defendant is entitled to no relief on this basis. See Nichols v. State, 90 S.W.3d 576, 607 (Tenn. 2002).

*Sentencing*

Finally, the Defendant contends that his sentence is excessive. The State disagrees.

Prior to imposing sentence, a trial court is required to consider the following:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in [Tennessee Code Annotated sections ] 40-35-113 and 40-35-114;

36

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2006).

The referenced "principles of sentencing" include the following: "the imposition of a sentence justly deserved in relation to the seriousness of the offense" and "[e]ncouraging effective rehabilitation of those defendants, where reasonably feasible, by promoting the use of alternative sentencing and correctional programs." Tenn. Code Ann. § 40-35-102(1), (3)(C) (2006). "The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(4), (5) (2006).

Our Sentencing Act also mandates as follows:

In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in [Tennessee Code Annotated sections] 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c) (2006).

Additionally, a sentence including confinement should be based on the following considerations:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1).

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). "[A] trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing decision." Id. at 709. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Id. at 709-10. Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden of demonstrating its impropriety. Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.; see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

At the sentencing hearing in this case, Joshua Dwayne Lusty testified that he grew up with the Defendant and considered him one of his best friends. He described the Defendant as "a kindhearted person." The Defendant "always helped [him] out when [he] needed things." Around the time that the Defendant committed the instant offenses, he noted the Defendant's change in attitude, describing the Defendant as "more withdrawn, more in a depressed nature" than ususal. He had never known the Defendant to be violent.

Jessica Teats, the Defendant's younger sister, described the Defendant as always being helpful at home. She never knew him to be violent. She testified that the Defendant was "always caring, willing to help others."

Jabir Al Bodruzzaman, the Defendant's fiancé's brother, testified that he had known the Defendant about six years. Asked about any changes he noticed in the Defendant after he was released on parole from an earlier incarceration, Bodruzzaman stated that he saw the Defendant "get really serious with school" and "try to pursue his career." He also noticed that the Defendant became "highly stressed out" by his illness. He added that he saw

"something really good" in the Defendant and that the Defendant "has done nothing but try to be helpful to everybody [he'd] seen around him."

Also admitted into evidence was the Defendant's presentence report and certified copies of the Defendant's prior convictions of felony possession of a weapon, pleaded to on April 12, 2001; possession with intent to sell over 26 grams of cocaine, pleaded to on April 12, 2001; misdemeanor evading arrest, pleaded to on April 12, 2001; and possession with intent to sell over .5 grams of cocaine, pleaded to on December 2, 1999. The certified copy of the amended judgment order entered on this last conviction provides in the "Special Conditions" section that the Defendant "concede[d] probation violation" on September 6, 2000.

After taking this proof under advisement, the trial court entered a Sentencing Order. The trial court sentenced the Defendant as a Range II offender, a classification the Defendant does not contest. The court then applied as enhancement factors the Defendant's previous criminal history in addition to that necessary to establish his range, his probation violation, and that the Defendant was on parole at the time he committed the instant offenses.[15] See Tenn. Code Ann. § 40-35-114(1), (8), (13)(B) (Supp. 2009). The court placed "great weight" on the first and last of these three enhancement factors. The court specifically rejected the Defendant's request that his sentence be mitigated on the basis that he was "suffering from a mental or physical condition that significantly reduced [his] culpability for the offense[s]," id. § 40-35-113(8) (2006), finding that "although [the Defendant] may suffer from a medical condition, there was no evidence that any mental health problems prevented him from understanding the acts he committed or excuse or justify his actions." The trial court also rejected the Defendant's suggestion that he "acted under duress." Id. § 40-35-113(12). The trial court gave "minimal weight" to the Defendant's contention that "[s]ubstantial grounds exist[ed] tending to excuse or justify [his] criminal conduct, though failing to establish a defense" and to his submission of "[a]ny other factor consistent with the purposes of" the Sentencing Act. Id. § 40-35-113(3), (13).

The trial court then imposed a mid-range sentence of seventeen years for the aggravated robbery conviction[16] and a mid-range sentence of thirty-three years for each of

---

[15] The record indicates that the Defendant was sentenced to twelve years' incarceration on his conviction for possession with intent to sell over 26 grams of cocaine. It is apparent, therefore, that the Defendant was on parole from this sentence at the time he committed the instant offenses in May 2009.

[16] The Range II sentence for aggravated robbery, a Class B felony, is twelve to twenty years. Tenn. Code Ann. § 40-35-112(b)(2) (2006).

the four especially aggravated kidnapping convictions.[17]  The trial court then ordered the sentences for the kidnapping convictions to run concurrently with each other but consecutively to the aggravated robbery sentence, for an effective term of fifty years in the TDOC.  The trial court based its imposition of partial consecutive service upon finding the Defendant to be "an offender whose record of criminal activity is extensive" and that he "is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high."  Tenn. Code Ann. § 40-35-115(b)(2), (4) (2006).  The court also found as follows:

> The Court finds this factor [for dangerous offender] applies as an aggregate term is necessary to appreciate the seriousness of this offense and is necessary to protect the public from further serious criminal conduct by this defendant. The Court finds consecutive sentencing is reasonably related to the severity of this offense, an offense that involved weapons and multiple victims who were put in fear of their lives.  The defendant has multiple prior convictions and was on parole at the time of the offense.  Based upon these prior convictions, the Court finds the defendant's criminal record to be extensive.

In his brief, the Defendant argues simply that the trial court "improperly weighed the applied mitigating factors," "applied an inappropriate enhancement factor," and that his sentence is "excessive."

We disagree.  First, the record supports the trial court's application of the three enhancement factors set forth above.  Moreover, we do not reweigh the various enhancement and mitigating factors applied by the trial court.  See Carter, 254 S.W.3d at 345-46.

Finally, the record supports the trial court's determination that partial consecutive service is appropriate.  Our sentencing statutes provide that a trial court may order sentences to be served consecutively on the basis of any of seven statutory criteria.  See Tenn. Code Ann. § 40-35-115(b).  As our supreme court has recognized, the satisfaction of only one of these criteria will support consecutive service.  See State v. Dickson, 413 S.W.3d 735, __, 2013 WL 5530670, at *11 (Tenn. 2013) (citing State v. Mickens, 123 S.W.3d 355, 394 (Tenn. Crim. App. 2003)).  In this case, the trial court determined that the preponderance of

---

[17] The Range II sentence for especially aggravated kidnapping, a Class A felony, is twenty-five to forty years.  Tenn. Code Ann. § 40-35-112(b)(1) (2006).  Sentences for especially aggravated kidnapping must be served at 100%.  Id. § 40-35-501(i)(1), (i)(2)(C) (Supp. 2009).

the evidence[18] established two criteria:  that the Defendant was "an offender whose record of criminal activity is extensive" and that he was "a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high."  Tenn. Code Ann. § 40-35-115(b)(2), (4).  We agree with the trial court that the Defendant's record of criminal activity is extensive.  In addition to the five very serious felonies at issue in this case,[19] the Defendant has previous convictions for three felonies, including a weapons offense, and one misdemeanor.  This history is sufficient to support the imposition of partial consecutive service as ordered in this case.

Accordingly, we hold that the Defendant is entitled to no relief on his sentence.

## Conclusion

For the reasons set forth above, we affirm the trial court's judgments of conviction and sentences.

_____
JEFFREY S. BIVINS, JUDGE

---

[18] See Tenn. Code Ann. § 40-35-115(b).

[19] This Court has recognized that "[c]urrent offenses may be used in determining criminal history for the purposes of consecutive sentencing."  State v. Carolyn J. Nobles, No. M2006-00695-CCA-R3-CD, 2007 WL 677861, at *12 (Tenn. Crim. App. Mar. 7, 2007) (citing State v. Cummings, 868 S.W.2d 661, 667 (Tenn. Crim. App. 1992)).